# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
March 26, 2001 Session

## WILLIAM H. DAVIS v. DAIRA F. DAVIS

**Appeal from the Circuit Court for Cocke County**
**No. 23,867-I  Ben W. Hooper, II, Judge**

**FILED AUGUST 13, 2001**

**No. E2000-02678-COA-R3-CV**

---

This appeal from the Cocke County Circuit Court questions whether the Trial Court erred in dividing the marital estate. Mr. Davis appeals the Trial Court's valuation of his closely held corporation, the payment of some debt by Mr. Davis, and the award of permanent periodic alimony to Ms. Davis. We affirm the decision of the Trial Court as modified and remand for such further proceedings, if any, consistent with this opinion. We adjudge costs of the appeal against the Appellant, William H. Davis and his surety.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed As Modified; Cause Remanded**

HOUSTON M. GODDARD, P.J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and D. MICHAEL SWINEY, JJ., joined.

Jerry W. Laughlin, Greeneville, Tennessee, for the Appellant, William H. Davis.

K. Karl Spalvins, Knoxville, Tennessee, for the Appellee, Daira F. Davis.

## OPINION

This appeal arises from a divorce between William H. Davis, the Appellant, and Daira F. Davis, the Appellee. Mr. Davis appeals the judgment of the Cocke County Circuit Court[1] and presents for our review four issues which we restate:

> I. Whether the Trial Court erred when it ruled, on remand, that the $17,767.98 payment Mr. Davis made to satisfy credit card obligations would not be credited

---

[1] Mr. Davis appealed the judgment of the Cocke County Circuit Court following the trial on July 21, 1998. This Court remanded the cause to the Trial Court for a final judgment. See *Davis v. Davis*, an unreported opinion of this Court, filed in Knoxville on October 4, 1999, No. 03A01-9901-CV-00016.

against the $208,386.00 judgment Ms. Davis received as her share of Mr. Davis's corporation, but was a separate responsibility for Mr. Davis.

II. Whether the Trial Court erred in determining the value of Mr. Davis's share of his closely held corporation.

III. Whether the Trial Court failed to equitably divide the marital assets, awarding Ms. Davis a substantially disproportionate share.

IV. Whether the Trial Court erred in awarding Ms. Davis permanent periodic alimony.

We affirm the judgment of the Trial Court as modified and remand for further proceedings, if any, consistent with this opinion.

The parties were married in Cocke County on April 23, 1981. There was one child born of this marriage, Diana Nicole Davis. The parties separated on November 24, 1994 and Mr. Davis filed a complaint for divorce on July 2, 1996. Following a trial on July 21, 1998, the Trial Court granted Mr. and Ms. Davis a divorce. Ms. Davis received custody of Diana Nicole Davis and Mr. Davis received reasonable and liberal visitation. Child support was also set in accordance with the child support guidelines. Mr. Davis was to provide health insurance for Ms. Davis for 18 months following the divorce. Additionally, he was to provide health insurance for the minor child and was responsible for any uncovered medical expenses.

As for the division of the marital estate, the Trial Court awarded Ms. Davis a 1990 Lincoln, and Mr. Davis a 1977 Jeep. There was a 1998 Jeep leased to United Business Forms, Inc., Mr. Davis's corporation, which was also awarded to him. No value was given to any of the automobiles by the Trial Court. The marital home was valued at $100,000.00 by Ms. Davis and $115,000.00 dollars by Mr. Davis. The contents of the marital home were valued by Ms. Davis at $3,000.00 and Mr. Davis at $9,000.00. The Court awarded the marital home and its contents to Ms. Davis without assigning a value to either the marital home or the contents and ordered Mr. Davis to pay the remaining mortgage on the home which was approximately $6,400.00 dollars.

The Davises had a 401K with a value of $29,468.69 which was awarded to Mr. Davis along with two IRA accounts; one with a value of approximately $12,000.00 and the other with a value of approximately $4,000.00. An account with $6,200.00 held by Mr. Davis for the purpose of purchasing a car for the minor child was awarded to Mr. Davis, and the Court ordered him to proceed with the purchase of an automobile for the minor child. Mr. Davis was ordered to provide insurance coverage for the automobile. Finally, there was a substantial amount of credit card debt at issue during the trial. The Trial Court ordered Mr. Davis to pay "a lump sum sufficient to pay off all of those credit card obligations." Ms. Davis was awarded permanent periodic alimony in the amount of $1,650.00 per month.

The only other property at issue is Mr. Davis's business. When the parties married, Mr. Davis and his brother, Horace Davis[2] were the principal shareholders of a closely help corporation, United Business Forms, Inc. According to the record, United Business Forms, Inc. is a printing business begun by Mr. Davis and Horace Davis in 1971. United Business Forms, Inc., (hereinafter referred to as UBF) manufactures snap-out business forms, and employs approximately 65 people. At the time of trial Mr. Davis and Horace Davis each owned 2550 shares of stock in UBF and each held slightly less than fifty percent of the corporate stock. A third shareholder, Mr. Ray Adams, owns the remaining three shares. In 1985 Mr. Davis and Horace Davis were the sole shareholders of UBF. At that time they entered into a Stock Redemption Agreement which is at issue on this appeal.

Following the trial, Mr. Davis filed a Notice of Appeal. This Court remanded the cause to the Trial Court for a final judgment. See *Davis v. Davis*, an unreported opinion of this Court, filed in Knoxville on October 4, 1999. According to the Order of the Court of Appeals, the Trial Court had reserved a question of the method of payment as to a lump sum judgment Ms. Davis was to receive from Mr. Davis. If the parties could not agree on a method of payment, the Trial Court would render a decision. At the time of oral argument on appeal, the parties had not agreed as to a method of payment. Therefore, this Court concluded the order was not a final one subject to an appeal as of right. The case was remanded to the Trial Court for a final judgment.

Following remand, Mr. Davis filed a Motion to Specify Terms of Judgment. On March 16, 2000, a hearing on that motion took place. The Trial Court held that beginning June, 2000, Mr. Davis would be obligated to pay $1500.00 per month toward the $208,386.00 judgment. Additionally, the Trial Court also determined that the $17,767.98 paid by Mr. Davis to satisfy Ms. Davis's credit card debt was not to be credited toward the $208,386.00 judgment, but that the two were separate liabilities. Mr. Davis also appeals this decision by the Trial Court.

We review the Trial Court's findings of fact *de novo* upon the record of the proceedings below, with a presumption of correctness "unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d); *see also Hass v. Knighton*, 676 S.W.2d 554 (Tenn. 1984). There is no presumption of correctness with regard to the trial court's conclusion of law, and those conclusions are reviewed *de novo*. *Jahn v. Jahn*, 932 S.W.2d 939 (Tenn. Ct. App. 1996).

I.

Mr. Davis's first issue on appeal is that the Trial Court erred when it ruled the $17,767.98 payment Mr. Davis made to satisfy the credit card obligation would not be credited against the $208,386.00 judgment Ms. Davis received. Mr. Davis argues that during the March 16, 2000, hearing on the Motion to Specify Terms of Judgment the Trial Court declared *sua sponte* that Mr. Davis was not entitled to a credit against the lump sum judgment. He asserts that Ms. Davis testified

---

[2] Our use of the first name of Horace Davis should not be construed as disrespectful, but is to avoid confusion in referring to two Mr. Davises.

that these were her individual debts and that she was willing to pay these debts. He further argues that both parties acknowledged that the $17,767.98 payment would be credited toward the lump sum payment and that the brief submitted by Ms. Davis during the first appeal to this Court reflects that acknowledgment. Therefore, it is Mr. Davis's argument that the Trial Court, upon remand, modified its original order, *sua sponte*, at the motion hearing on March 16, 2000.

Ms. Davis argues that the original judgment required Mr. Davis to pay to her the amount of $208,386.00 for her interest in UBF. She further asserts that Mr. Davis was also required to pay the credit card debt, which was to be paid in a lump sum. Ms. Davis argues that Mr. Davis was the party who filed the Motion to Specify Terms of Judgment and that the Trial Court was ordered to resolve the issue as to the terms of payment of the $208,386.00 judgment, and at the time of the hearing on March 16, 2000, Mr. Davis had not paid any amount toward that judgment, but had paid $17,767.98 toward the satisfaction of the credit card debt. Ms. Davis argues that Mr. Davis initiated the discussion at the motion hearing concerning the credit toward the $208,386.00 judgment, and that now he is trying to argue on appeal that the Trial Court's ruling on that matter was *sua sponte*. Finally, Ms. Davis argues that the Trial Court was merely clarifying for Mr. Davis, upon his request, its order from the July 21, 1998, hearing.

Upon review of the transcript of the hearing on July 21, 1998, and the transcript of the hearing March 16, 2000, we agree with Ms. Davis. At the July 21, 1998, hearing, the Trial Court stated the following:

> In order to make the other awards and figures that I've used in this decision to equal out, it means that Mr. Davis would be obligated to pay Ms. Davis for her interest in the business the sum of $208,000 . . . $208,386.
>
> The Court is going to also require that an amount sufficient to pay all of her credit card obligations, including one-half of those which I'm going to order them to pay equally, and that being Proffitt's and Lowe's, he'll have to pay a lump sum sufficient to pay off all of those credit card obligations.
>
> Now, the Court is not going to make a ruling at this time on how the balance of that will be paid, so that you all will be given an opportunity to see if you can agree upon some manner or method of payment, however you wish to do it. Now, if you can't do it, then we'll have to have a further hearing on it.

The Order from this hearing filed on December 14, 1998, nunc pro tunc July 21, 1998, states the following with respect to this matter:

11.  Mr. Davis shall be obligated to pay to Mrs. Davis the sum of Two Hundred Eight Thousand Three Hundred Eighty Six Dollars ($208,386.00) for her interest in the business.  Mr. Davis shall pay in a lump sum an amount sufficient to satisfy all of Mrs. Davis's credit card obligations and one-half of the credit card obligations to Proffitts and Lowes.  The parties are hereby granted an opportunity to reach an agreement upon some manner or method for the payment of the balance.  Absent such an agreement, upon proper motion the Court will make a ruling on the manner and method for the payment of the balance.

According to the transcript of the motion hearing on March 16, 2000, this issue was addressed.  The lawyers for the parties were discussing how the lump sum payment of $208,386.00 would be paid to Ms. Davis and the following discussion took place:

> The Court:  The credit card billing.  Let me see here a minute.  We're down to what, $190,618.02?
>
> Mr. Spalvins [attorney for Ms. Davis]:  No, Your Honor.  I don't think that's the way that is calculated.  I think her interest in the business was separate and additional and I think the interest in the business of $208,000-some dollars is still solid.
>
> Mr. Laughlin [attorney for Mr. Davis]:  No, Your Honor.  I think it's quite clear that that's to be a credit against the amount for which he was obligated to pay her for her interest, what the Court determined to be her interest in the stock.
>
> The Court:  Okay.  Let me, where is . . . well, I'm not going to ask you where it is, let me find the Order.  Let's take this education business first.  Has she enrolled in school or anything?
>
> [the Court moves on to another matter briefly]
>
> The Court:  In reading my opinion which is very short, I do not find that there is a credit against the sum of $208,386.00.
>
> Mr. Laughlin:  Can I mention to the Court the language on Page 5?
>
> The Court:  Yeah, I just got through reading that.

Mr. Laughlin: I'm sorry, Your Honor. On Page 4 it talks about $208,000.00, I'm sorry.

The Court: Okay.

Mr. Laughlin: And then it talks in terms in the very last paragraph about the payment of the credit card obligations and then continuing onto the next page, it talks about the payment of the balance of that, payment of the balance of the $208 . . .

Mr. Spalvins: Where are you reading from? I've got the judgment before me?

Mr. Laughlin: I'm sorry. We're reading from the Memorandum Opinion, Page 5.

Mr. Spalvins: Oh, okay. All right.

Mr. Laughlin: And it says, give the opportunity it talks in terms of the balance of this amount, and that's why we believe that the Court intended to take the credit card obligations, her credit card obligations a credit, if you will, against the $208, because . . .

The Court: I see and understand why you're saying that. But when I have said that the Court is going to also require that an amount sufficient to pay all of her credit card obligations and having just stated that he owed her $208,386.00, and then I say is also going to require. That language is, I can pretty well tell what I meant by reading what I said, so there will not be a credit there.

It appears from this discussion that the Trial Court was merely clarifying an earlier point addressed by the attorney at the motion hearing. The Trial Court reviewed the Memorandum Opinion and pointed out that the language, "the Court is going to also require that an amount sufficient to pay all of her credit card obligations . . ." is the language suggesting that no credit was intended.

Mr. Davis argued that the Trial Court changed its previous ruling *sua sponte* at the motion hearing. The term *sua sponte* is defined as, "of his or its own will or motion; voluntarily; without prompting or suggestion." *Black's Law Dictionary* 1424 (6th ed. 1990). We do not find that the Trial Court addressed this issue *sua sponte*. The aforementioned discussion clearly shows that the attorneys had different opinions as to what the Trial Court ordered at the July 21, 1998, hearing and therefore turned to the Trial Court for clarification. The Trial Court reviewed the Memorandum

-6-

Opinion, pointed out specific language and reiterated his decision from the prior hearing. No changes were made to the prior order, only clarification. The Trial Court is in the best position to clarify an order set forth by said Trial Court. We therefore find that the trial Court did not err in clarifying the previous court order.

## II.

The second issue this Court will address is the Trial Court's valuation of Mr. Davis's Corporation. The Trial Court determined that on January 1, 1981, UBF had a value of $22,000.00 and at the "time material to this litigation" UBF had a value of $517,705.00 dollars. Ms. Davis was awarded $208,386.00 as her interest in UBF. Dividing a marital estate begins with classifying the property as either separate or marital property. *McClellan v. McClellan*, 873 S.W.2d 350 (Tenn. Ct. App. 1993). The Trial Court did not make a determination as to whether UBF was Mr. Davis's separate property or marital property, therefore it is incumbent upon this Court to make that determination before evaluating whether the Trial Court erred in its value determination and in dividing the marital assets.

Marital property is defined at T.C.A. 36-4-121(b)(1)(B) as follows:

> "Marital Property" includes income from, and any increase in value during the marriage of, property determined to be separate property in accordance with subdivision (b)(2) if each party substantially contributed to its preservation and appreciation, and the value of vested and unvested pension, vested and unvested stock option rights, retirement or other fringe benefit rights relating to employment that accrued during the period of the marriage.

Separate property is defined at T.C.A. 36-4-121(b)(2)(A) as "All real and personal property owned by a spouse before marriage."

Because Mr. Davis owned stock in UBF prior to his marriage to Ms. Davis, we find that UBF is Mr. Davis's separate property. However, UBF's increase in value during the marriage is marital property pursuant to T.C.A. 36-4-121(b)(1)(B), "any increase in value during the marriage of, property determined to be separate property in accordance with subdivision (b)(2) if each party substantially contributed to its preservation and appreciation". "Substantial contribution" includes but is not limited to the "direct or indirect contribution of a spouse as homemaker, wage earner, parent or family financial manager." T.C.A. 36-4-121(b)(1)(D). A spouse's "indirect contributions as homemaker constitute contributions to the appreciation or preservation of the other spouse's separate property." *Cohen v. Cohen*, 937 S.W.2d 823 (Tenn. 1996).

Upon review of the testimony of Ms. Davis, we find that she did "substantially contribute" to the appreciation of UBF. Ms. Davis testified that when she married Mr. Davis she had two years of college education. Upon her marriage to Mr. Davis she dropped out of school and became a homemaker. Shortly thereafter Mr. and Ms. Davis had a daughter. There is no dispute as to Ms.

Davis's role as homemaker and parent. In addition to Ms. Davis's aforementioned indirect contributions to UBF, she also contributed directly to UBF. Ms. Davis testified that twice she had been employed at UBF. The first time she began working there was shortly after the birth of their daughter. Ms. Davis testified that she went to work at the request of Mr. Davis because UBF was short-handed. Ms. Davis further testified she worked two to three years for UBF during another time period. Ms. Davis testified that she went to Salt Lake City with Mr. Davis on a business trip to purchase equipment for UBF and she attended a convention in Charlotte, North Carolina with Mr. Davis. Additionally, she accompanied Mr. Davis on a business trip to Atlanta, Georgia to a paper company. Therefore, while UBF is considered the separate property of Mr. Davis, the increase in value of UBF is considered a marital asset.

As for the valuation of Mr. Davis's share of UBF, Mr. Davis argues that the Trial Court erred in assessing his value in UBF at $517,705.00. Mr. Davis asserts that UBF is subject to a Stock Redemption Agreement and that this agreement provides that if Mr. Davis attempts to sell or encumber his stock in UBF, UBF has the right to redeem the stock for $175,000.00 dollars, and if it fails to do so the other stockholders have the right to purchase Mr. Davis's stock for the same price. Therefore, Mr. Davis argues that there is no way the value of his shares of UBF can exceed $175,000.00. Mr. Davis further argues that the Trial Court erred in adopting the opinion of LeRoy Bible, a certified public accountant, who testified on behalf of Ms. Davis as to the value of Mr. Davis's share of UBF. Mr. Davis asserts that it is evident Mr. Bible did not consider the effect of the Stock Redemption Agreement in arriving at his opinion that Mr. Davis's share of UBF was between $518,503.00 and $517,705.00.

Mr. Davis relies on the case of *Erwin v. Erwin*, an unreported opinion of this Court, filed in Nashville on March 25, 1988, arguing that a Trial Court must take into consideration the effect any stock redemption agreements might have on a corporation when placing a value on that asset. We agree with Mr. Davis's argument as to what *Erwin v. Erwin* holds with respect to valuing an asset when a stock redemption agreement is in place. The Court states that "if the true value of the stock is greater than its agreed value, then its value for purposes of this suit would be somewhat greater than its agreed value and somewhat less than its true value." It also sets forth the premise that if the stockholder chooses to sell his share of the corporation, then the stock redemption agreement forces the value of those shares of stock to be sold at a set price. However, the Court further notes that if the stockholder continues to hold onto the shares of stock he is free to continue to "reap all the benefits of ownership without offering it for sale."

Ms. Davis argues that each party presented expert testimony and the Trial Court had a wide range of values for Mr. Davis's share of UBF from which the Trial Court chose $517,705.00. Ms. Davis further argues that the methods used by both experts are valid means of placing a value on a corporation and that there is no requirement that Trial Courts rely on stock redemption agreements when assessing the value of a corporation for the purpose of dividing assets in a divorce.

The valuation of a marital asset is a question of fact to be determined by considering all relevant evidence. *Kinard v. Kinard*, 986 S.W.2d 220 (Tenn. Ct. App. 1998). Each party bears the

burden of bringing forth competent evidence. *Wallace v. Wallace*, 733 S.W.2d 102 (Tenn. Ct. App. 1987). If the evidence the parties set forth as to value is conflicting, the trial judge may assign a value that is within the range of values supported by the evidence. *Ray v. Ray*, 916 S.W.2d 469 (Tenn.Ct. App. 1995). On appeal, we presume the trial judge's factual determinations are correct unless the evidence preponderates against them. *Jahn v. Jahn*, 932 S.W.2d 939 (Tenn. Ct. App. 1996).

Mr. and Ms. Davis both presented expert testimony at the trial as to the value of UBF. Mr. Ray Adams, CPA, testified on behalf of Mr. Davis, and Mr. LeRoy Bible, CPA, testified on behalf of Ms. Davis. According to the record, Mr. Adams used a "capitalization of income" method and a "weighted average" method to determine the value of UBF. Under the "normal average" Mr. Adams arrived at a value of $126,900.00 and the weighted average he arrived at $142,200.00. A discount was applied by Mr. Adams in arriving at the aforementioned values for "lack of control" and "lack of marketability." Mr. Adams further testified that he did not take into consideration a method of valuation based on comparable sales of similarly situated businesses as he was unable to find such comparable businesses. Mr. Adams also testified as to the value of UBF based on using a "cost method." Using this method Mr. Adams testified that the value of Mr. Davis's interest in UBF was $270,800.00. Finally, averaging the results under each method used Mr. Adams testified that he arrived at the figure $180,000.00. Finally, Mr. Adams testified that the book value for UBF was 1,095,000.00. From this figure tax liability was subtracted, a discount was taken for a minority share and a discount was taken for lack of marketability arriving at the figure $278,831.00 which he rounded to $270,800.00.

Mr. Bible, testifying on behalf of Ms. Davis, stated that he valued the business in December 1980, a few months prior to the marriage of Mr. and Ms. Davis. Mr. Bible stated that Mr. Davis's share of UBF based on that valuation was $20,000.00 to $22,000.00. Mr. Bible also valued UBF in December, 1996. Mr. Bible testified that he used a "weighted average." He also testified that the preferred method of placing a value on this corporation was to find a comparable sale, but he, like Mr. Adams, was unable to find one. According to Mr. Bible, the method he used is referred to by the Internal Revenue Service as the "industry standard." Additionally, discounts were taken for lack of control and marketability. Mr. Bible arrived at $203.00 per share multiplied by the number of shares Mr. Davis owns[3] for a total of $518,000.00. Mr. Bible testified that a value of $517,705.00 which he arrived at using numbers that Mr. Adams had provided was also a fair representation of the value of Mr. Davis's interest in UBF.

While we agree that the stock redemption agreement should be considered in placing a value on Mr. Davis's share of UBF, there is absolutely no evidence that Mr. Bible did not consider the agreement in arriving at his figures. At no point was Mr. Bible asked on direct examination or cross-examination whether he considered the stock redemption agreement when valuing Mr. Davis's share of the corporation. It was the responsibility of Mr. Davis to insure that Mr. Bible had the appropriate

_____

[3] Mr. Davis owns 2550 shares of stock.

documentation in order for him to do a competent valuation of his corporation. This Court cannot automatically assume simply because Mr. Davis argues that Mr. Bible did not consider the stock redemption agreement that that was the case, nor can this Court assume that the value of Mr. Davis's stock is $175,000.00 because the stock redemption agreement may prevent its sale at a higher price. Therefore, we find that the evidence does not preponderate against the Trial Court's valuation of Mr. Davis's share in UBF of $517,705.00.

III.

Mr. Davis's third issue on appeal questions whether the Trial Court erred in dividing the marital assets and liabilities; thereby granting Ms. Davis a disproportionate share of the assets. He further contends that the Trial Court did so without consideration of the statutory criteria upon which such divisions should be based. More specifically he argues that the Trial Court ignored the factors set forth in T.C.A. 36-4-121(c).

"Trial Courts have wide latitude in fashioning an equitable division of marital property." *Brown v. Brown*, 913 S.W.2d 163 (Tenn. Ct. App. 1994). The standard factors set forth in T.C.A. 36-4-121(c) must be considered. This Court has further stated in *Batson v. Batson*, 769 S.W.2d 849 (Tenn. Ct. App. 1988) the following:

> an equitable property division is not necessarily an equal one. It is not achieved by a mechanical application of the statutory factors, but rather by considering and weighing the most relevant factors in light of the unique facts of the case.

Appellate Courts are to defer to a Trial Court's division of marital property unless that division is unsupported by a preponderance of the evidence or inconsistent with the statutory factors. *Brown v. Brown*, 913 S.W.2d 163 (Tenn. Ct. App. 1994).

The Trial Court's division of the marital assets and liabilities as modified by this opinion is as follows:

| Asset | Value | Mr. Davis | Ms. Davis |
|---|---|---|---|
| 1990 Lincoln | (no value stated) | | (no value stated) |
| 1977 Jeep | (no value stated) | (no value stated) | |
| 1998 Jeep | (leased to UBF) | (leased to UBF) | |
| IRA #1 | $ 12,000.00 | $ 12,000.00 | |
| IRA #2 | 4,000.00 | 4,000.00 | |
| 401K | 29,468.69 | 29,468.69 | |

| | | | |
|---|---|---|---|
| Marital home[4] | 100,000.00 | | $100,000.00 |
| Mortgage on home | (6,400.00) | (6,400.00) | |
| Household furnishings[5] | 3,000.00 | | 3,000.00 |
| Credit card debt | (17,767.98) | (17,767.98) | |
| UBF[6] | 506,705.00 | 298,319.00 | 208,386.00 |
| Total | $631,005.71 | $319,619.71 | $311,386.00 |
| Percentage of assets | | 50.7% | 49.3% |

We find that the division of the marital assets in this case is equitable. A division of marital assets is not inequitable simply because it is not precisely equal. *Kinard v. Kinard*, 986 S.W.2d 220 (Tenn. Ct. App. 1998).

The statutory factors that are most determinative on this issue are the following: (1) the duration of this marriage; (2) Mr. Davis is part owner in a successful business that continues to generate a stable income for him while Ms. Davis lacks the earning capacity and employability to match that of Mr. Davis; (3) Ms. Davis did contribute both directly and indirectly as employee, spouse, mother, and homemaker to Mr. Davis's successful business; (4) Ms. Davis is currently employed at a hospital emergency room making approximately $215.00 a week while Mr. Davis retains UBF as his separate property and will continue to reap the benefits of his ownership shares in the corporation.

Upon review of the statutory factors set forth in T.C.A. 36-4-121(c), we do not find that the evidence preponderates against the Trial Court's division of the marital assets and therefore affirm the Trial Court's division of the marital assets.

---

[4] Mr. Davis testified that the value of the marital home was $115,000.00 while Ms. Davis testified that the value of the marital home was $100,000.00. The Trial Court failed to place a value on the home. Here it makes no difference in our evaluation of the appropriateness of the Trial Court's division whether we use the higher or lower of these values as our conclusion is the same regardless of which values are used. To simplify the calculation, we use only one of the values, the lower.

[5] Mr. Davis estimated that the household furnishings were worth $9,000.00 and Ms. Davis estimated their value at $3,000.00. Again, it makes no difference in our evaluation of the appropriateness of the Trial Court's division whether we use the higher or lower of these values. However, in order to remain consistent, we choose the lower value.

[6] The marital assets include the increase in value of UBF which can be calculated as follows: $517,705.00 (Mr. Davis's share in UBF) - $11,000.00(one half of the value of UBF in 1981) = $506,705.00.

IV.

Mr. Davis's fourth issue on appeal is whether the Trial Court erred in awarding Ms. Davis permanent periodic alimony. During the hearing on July 21, 1998, the Trial Court, in its Memorandum Opinion stated the following with respect to rehabilitative alimony:

> Now, with respect to what we just generally call rehabilitation alimony, I'm going to provide that there will be an amount paid over the next five years, if the wife does, in fact, enroll in school to further her education and the amount to be paid will be the actual cost of the tuition and books, which means if she does not enroll then there will be nothing to be paid.
>
> Alimony in the amount of $1,650 per month will be paid. Of course, we know that by statute that is paid for as long as she lives or, I guess, it could even go against his estate if he were to predecease her, but upon your remarriage or cohabitation with a third party, then that would be terminated.

Following this Court's remand of the first appeal to the Trial Court[7] and the subsequent hearing on March 16, 2000, the Trial Court, upon the request of this Court, attempted to set parameters as to where Ms. Davis could attend school and still expect Mr. Davis to pay for tuition. The Trial Court determined the following in pertinent part:

> The Court:      Let's take this education business first. Has she enrolled in school or anything?
>
> Mr. Spalvins:  No, Your Honor, she has not.
>
> The Court:      So that doesn't even. . . Well, is she going to?
>
> Mr. Spalvins:  She says "no", Your Honor.
>
> The Court:      If that be the case then at least I'm going to remove from the Appellate Court's consideration anything concerning that particular matter; that it is now no longer a part of this litigation in any respect, it's resolved by her announcement of not going to school,

---

[7] See *Davis v. Davis*, an unreported opinion of this Court, filed in Knoxville on October 4, 1999. No. 03A01-9901-CV-00016.

-12-

because they had mentioned that as being a loose end. Now, he's paying $1650.00 alimony, having no problem with that.

Mr. Spalvins:  Initially there were some problems but I think that's kind of been smoothed out, Your Honor.

Following the hearing on March 16, 2000, the Trial Court amended its original order and determined that Ms. Davis no longer needed rehabilitative alimony as she was no longer interested in returning to college.

Mr. Davis makes several arguments concerning the alimony award. First, he argues that the Trial Court made no finding that Ms. Davis was economically disadvantaged relative to Mr. Davis, and that no such status exists due to the division of the marital assets at trial. Additionally, Mr. Davis argues that because the Trial Court initially awarded Ms. Davis rehabilitative alimony she is obviously capable of rehabilitation and therefore rehabilitative alimony should be awarded rather than permanent periodic alimony. Finally, Mr. Davis argues that Ms. Davis is able to work and that she only expected to receive rehabilitative alimony pending the completion of her college education, and therefore, rehabilitative alimony is the only form of alimony appropriate.

Ms. Davis argues that the Trial Court did find that she was economically disadvantaged as compared to Mr. Davis. Additionally, she argues that since the parties separation she has been unable to maintain the standard of living to which she was accustomed during her marriage.

The Trial Court has broad discretion in determining an award of alimony. *Loyd v. Loyd*, 860 S.W.2d 409 (Tenn. Ct. App. 1993). The decision is factually driven and requires a balancing of the factors listed in T.C.A. 36-5-101(d); *Loyd v. Loyd*, 860 S.W.2d 409 (Tenn. Ct. App. 1993). Of these factors, need and the ability to pay are the most critical. *Lancaster v. Lancaster*, 671 S.W.2d 501 Accordingly, this Court is not inclined to alter a trial court's award of alimony unless it is unsupported by the evidence or is contrary to the public policy embodied in the applicable statutes. *Brown v. Brown*, 913 S.W.2d 163 (Tenn.Ct.App.1994).

The following factors, codified at T.C.A. 36-5-101(d)(1) are to be considered in determining an award of alimony:

> (d)(1) It is the intent of the general assembly that a spouse who is economically disadvantaged, relative to the other spouse, be rehabilitated whenever possible by the granting of an order for payment of rehabilitative, temporary support and maintenance. Where there is such relative economic disadvantage and rehabilitation is not feasible in consideration of all relevant factors, including those set out in this subsection, then the court may grant an order for payment of support and maintenance on a long-term basis or until the

-13-

death or remarriage of the recipient except as otherwise provided in subdivision (a)(3). Rehabilitative support and maintenance is a separate class of spousal support as distinguished from alimony in solido and periodic alimony. In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:

(A) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(B) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earning capacity to a reasonable level;

(C) The duration of the marriage;

(D) The age and mental condition of each party;

(E) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(F) The extent to which it would be undesirable for a party to seek employment outside the home because such party will be custodian of a minor child of the marriage;

(G) The separate assets of each party, both real and personal, tangible and intangible;

(H) The provisions made with regard to the marital property as defined in § 36-4-121;

(I) The standard of living of the parties established during the marriage;

(J) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(K) The relative fault of the parties in cases where the court, in its discretion, deems it appropriate to do so; and

(L) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.


We find that Ms. Davis is economically disadvantaged as compared to Mr. Davis. Ms. Davis is currently making less than $1,000.00 a month while Mr. Davis maintains his closely held corporation which generates an income of at least $1,000.00 per week. Additionally, Ms. Davis has a very limited work history and lacks a post-secondary degree or any technical training for a

specified area of vocation. Even with the income Ms. Davis is currently receiving from her employment, it is evident that she cannot match the earning capacity of Mr. Davis. The purpose of spousal support is to assist the disadvantaged spouse in becoming self-sufficient and when economic rehabilitation is not feasible, to mitigate the harsh economic reality of divorce. *Anderton v. Anderton*, 988 S.W.2d 675 (Tenn. Ct. App. 1998). Divorced couples often lack sufficient income or assets to enable both parties to maintain their pre-divorce standard of living, however, the obligor spouse may be able to provide some financial assistance to enable the disadvantaged spouse to approach his or her former financial condition. *Anderton v. Anderton*, 988 S.W.2d 675 (Tenn. Ct. App. 1998).

In Tennessee there is a preference for rehabilitative alimony. However, where rehabilitation is not feasible, a court may grant alimony *in futuro*. T.C.A. 36-5-101(d)(1). The Trial Court did originally determine based upon testimony by Ms. Davis that rehabilitative alimony was appropriate as it was Ms. Davis's desire to return to college and complete her degree. However, in addition to the original award of rehabilitative alimony the Trial Court also awarded Ms. Davis alimony *in futuro* in the amount of $1650.00 per month. The Trial Court later determined that because Ms. Davis had obtained a job and no longer desired to attend college, the Trial Court deleted Mr. Davis's rehabilitative alimony responsibility.

This Court does not find that rehabilitation of Ms. Davis is feasible. While we are not discouraging her from returning to college some day, we find that rehabilitation would be difficult for Ms. Davis as it pertains to this proceeding. Even if Ms. Davis were to return to college and obtain a degree, it would be difficult for her to ever achieve a level of financial security equal to that of Mr. Davis or for her to obtain a reasonable standard of living when viewed in the context of her pre-divorce economic condition. Ms. Davis testified to a very limited work history, most of which she obtained working in Mr. Davis's corporation. She lacks a post-secondary degree or vocational skills. Ms. Davis's age (47 years old) is also a factor in determining that rehabilitation is not feasible. She testified that she has generated some income hanging wallpaper, but that that was only part-time. Additionally, Ms. Davis testified very generally to several health problems including a hearing problem, high blood pressure and a heart condition. It is evident from the record, however, that these ailments are not currently preventing her from working as she has obtained employment in a hospital emergency room. We find that the rehabilitation of Ms. Davis is not feasible.

As for alimony *in futuro*, the Trial Court granted Ms. Davis $1650.00 per month for the remainder of her life or until she remarries or co-habits with another person. Ms. Davis signed an affidavit of income and expenses on July 20, 1998, whereby she documented that her needs amounted to $5,035.16 per month. We find this to be excessive. In her affidavit, Ms. Davis included $300.00 per month for her mortgage payment. However, Mr. Davis has paid the mortgage in its entirety and Ms. Davis was awarded the marital home free and clear of any outstanding mortgage. Also, Ms. Davis documented that she needed $200.00 per month for school expenses but Ms. Davis has stated she is no longer interested in attending school and their daughter has now graduated from high school. Ms. Davis also stated that she needs $1,800.00 per month for installment payments on her credit card bills, but Mr. Davis paid the balance on her outstanding credit card bills in the amount of $17,767.98. Ms. Davis also listed automobile insurance for four

people and four automobiles in the amount of $200.00 per month. At trial she was awarded one automobile, and Mr. Davis was required to purchase an automobile for their daughter and maintain the automobile insurance. Therefore, we will reduce her need for automobile insurance to $100.00 per month. Ms. Davis listed recreation and entertainment as $200.00 per month and miscellaneous was listed twice at $200.00 per listing for a total monthly expense of $400.00. Finally, Ms. Davis listed $125.00 per month for vacations, $150.00 per month for a weight loss program and $66.00 per month for gifts. This equals $3,341.00 in excessive expenses. That brings her need from $5,035.16 to $1,694.16 which is at least a more reasonable figure than the one presented by Ms. Davis.

Ms. Davis testified that she currently makes approximately $215.00 dollars per week. That is approximately $900.00 per month income. In addition, she received one half of the marital estate including a lump sum award of $208,386.00 to be paid at $1,500.00 per month plus interest. We believe the award of $1650.00 per month alimony *in futuro* was excessive considering the division of marital assets and the need demonstrated by Ms. Davis. We therefore reduce her alimony *in futuro* from $1650.00 per month to $1,000.00 per month effective on the date this decision becomes final.

For the foregoing reasons the judgment of the Trial Court is affirmed as modified. This cause is remanded for proceedings not inconsistent with this opinion. Costs of appeal are adjudged against Appellant, William H. Davis and his surety.

_____
HOUSTON M. GODDARD, PRESIDING JUDGE

-16-